## Charles T. Trego, Appellee, v. Tobias Rubovits, Appellant.

### Gen. No. 27,601.

1. APPEAL AND ERROR—*decision on former appeal as law of the case.* The Appellate Court, on appeal from the judgment rendered after a retrial following a former appeal of the same cause which left but a single issue to be decided on the retrial, is bound by the former decision not to consider any questions other than the one in question.

2. LANDLORD AND TENANT—*conclusiveness of verdict that appliance is part of demised premises.* A verdict for the landlord against his lessees, based on the jury's finding that a meter attached to the sheave wheel, over which were suspended the cables which carried the elevator car, was a part of the elevator within the meaning of the tenants' covenant to keep the elevator in repair is not against the weight of evidence where, although it is shown that the meter might have been attached to another part of the apparatus so that it could not have caused any injury in case it fell, there is substantial evidence that the meter is a necessary part of the mechanism, that such meters are customarily attached as was the one in question, that the meter in question was so attached at the time the lease was entered into and was an integral part of the whole elevator structure.

Appeal by defendant from the Circuit Court of Cook county; the Hon. G. FRED RUSH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Affirmed. Opinion filed April 11, 1923. Rehearing denied April 26, 1923. *Certiorari* denied by Supreme Court (making opinion final).

ROSENTHAL, KURZ & HOULIHAN, for appellant; JAMES ROSENTHAL and SIDNEY LEVY, of counsel.

JUDAH, WILLARD, WOLF & REICHMANN, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, Trego, being the owner of 163 and 165 Fifth avenue, Chicago, on November 4, 1891, leased

to Edward and Tobias Rubovits the first floor, basement and third floor "together with the use of the elevator, halls and stairways in said building, jointly with the other tenants of said building," from January 1, 1892, to December 31, 1896, for a total rental of $29,000, to be paid in certain monthly instalments.

The lease contained the promise by the lessees that they "shall make all repairs needed in or about said premises and will also, at their own expense, keep the elevator in good condition and repair." The building contained four stories and a basement.

On February 16, 1894, one McDonald, while riding in the elevator of the demised premises, was struck by the fall of a water meter, which had been attached to the sheave wheel at the top of the elevator, and was injured. On February 15, 1896, McDonald brought suit in the circuit court of Cook county against the plaintiff to recover damages for the injuries sustained, on the ground that the injury resulted because Trego, the lessor, as owner of the premises had "negligently failed to keep said premises in repair"; and on April 21, 1896, recovered judgment in the sum of $4,000 and costs of suit.

Subsequently, that judgment was satisfied by the payment to him by the lessor, Trego, of $2,000 together with $400 attorney's fees and $111.28 other expenses, making in all a total of $2,511.28.

Later, the plaintiff herein, Trego, instituted the present action in covenant against Edward and Tobias Rubovits, claiming that they were liable over to him for the damages, which he was compelled to pay in the McDonald case, by reason of the provision in the lease, which reads as follows: "It is expressly understood that during said term said parties of the second part shall make all repairs needed in or about said premises and will also, at their own expense, keep the elevator in good condition and repair."

The declaration in the instant case sets forth,

among other things, that although having entered into and received the premises in good order and repair, the defendant permitted the elevator to become and continue out of repair by reason whereof McDonald was injured by the falling of a certain water meter or register, which was one of the attachments of the elevator and which was used for the purpose of measuring the water used in operating the elevator and which was fastened and attached to the spokes of the hoisting sheave of the elevator. The declaration also sets up the prior suit of *McDonald v. Trego,* the judgment obtained therein, and that while it was pending he, Trego, notified the defendants in writing that the suit was pending and requested them to appear and defend the suit, but that they failed to do so.

The defendant, Tobias Rubovits, pleaded that he and Edward Rubovits did at all times keep the elevator in good condition and repair; that the water meter was not part of the elevator; that the water meter was not securely fastened to the elevator; that the water meter fell and injured McDonald because the plaintiff failed in his undertaking to properly fix and fasten the water meter to the elevator and to maintain it in that condition; that the judgment recovered by McDonald was wholly based on the negligence of Trego, the lessor.

He further pleaded that Trego long prior to the time when McDonald was injured had full notice of the supposed defects and lack of repair set forth in the declaration and had possession and control of the elevator and the right to repair it and could have done so at a small expense.

The record shows that owing to the death of Edward Rubovits the suit was abated as to him. There was a trial, a judgment in favor of the plaintiff in the sum of $2,511.28, an appeal to this court, and on March 12, 1913, that judgment was reversed. *Trego v. Rubovits,* 178 Ill. App. 127. After remandment, there was

a new trial, a verdict and judgment in favor of the plaintiff, Trego, in the sum of $2,511, and from that this appeal was taken.

Inasmuch as this cause has once before been passed upon by this court, and what was stated in the former opinion, concerning the principles of law applicable to the facts there before the court, is the law of this case as well for this court as for the court below, it would be a work of supererogation to enter upon a discussion of the numerous questions now raised and argued by counsel, which were passed upon and definitely decided on the former appeal. *Delta Bag Co. v. Kearns,* 160 Ill. App. 93; *Daughetee v. Ohio Oil Co.,* 181 Ill. App. 135. We have examined the briefs filed on the former appeal and the elaborate briefs filed upon the granting of a petition for rehearing, and are compelled to conclude that the only substantial question that remained for determination upon a new trial was whether the "water meter in question is a part of the elevator within the meaning of the lease."

At the first trial of this cause the trial judge directed a verdict for the plaintiff, and this court, on the appeal from a judgment on that verdict, decided that as there was evidence tending "to show that the meter in question was not a part of the elevator," it was error on the part of the trial judge to refuse to submit the case to the jury. Accordingly, the first judgment was reversed, the cause remanded, a new trial was had, and, upon the evidence and instructions submitted to the jury, there was then a verdict and judgment for the plaintiff. And, in that state of the record, it is our opinion that we are now only entitled to consider whether the evidence is sufficient to justify the conclusion of the jury that the water meter, within the meaning of the lease, was a part of the elevator. In the opinion delivered by Mr. Justice Duncan— while sitting in the Appellate Court—upon a rehearing, the following language is used: "We necessarily

are forced to conclude that there is no liability against appellant (Rubovits) in this case, unless the water meter in question is a part of the elevator within the meaning of the lease. We are still of the opinion that this question is one of fact to be settled by a jury, after it has heard all the evidence bearing on that question. With the meager evidence, in the record bearing on that question, although it is not contradictory, we are unable to say that reasonable minds would not reach different conclusions therefrom. We, at least, are unable to say, upon the evidence in the record, that the meter in question is a part and parcel of the elevator within the meaning of the said covenant to keep the elevator 'in good condition and repair.' We, therefore, are unable to recede from our former conclusions, as announced in the foregoing opinion, which is refiled as our opinion in this case.''

The elevator was a hydraulic elevator, operated by water power, and the water meter was there to measure the water which was consumed in its operation. The lessees occupied all of the building except the second and fourth floors and one half of the store, numbered 167. The elevator was located in the center of the building at the rear, between the two stores, and was the only elevator in the building. It was used, apparently, both for freight and passengers.

The witness Vargess, who was employed in the building at the time of the injury to McDonald, testifield that from month to month for five or six or seven months prior to the accident, he greased the sides of the elevator; that in doing so he went within about a foot or a foot and a half of the sheave wheel which had the water meter on it; that he greased the side of the sheave wheel itself. The sheave wheel was at the top, and over it passed the cable. He further testified that when he went up there he never noticed that anything connected with the meter was out of order or loose; that when he went up and down the

elevator he never heard any sound of the meter sliding back and forth; that the last time he went up the elevator was about a month before the injury occurred. On cross-examination, he stated that he was employed as shipping clerk by one of the tenants of the building who was in the cigar business; that he was employed by a son of Charles Trego to grease the elevator and the sheave wheel on the sides; that he did it for about seven months.

The witness Krelle, who at the time of the injury was working for E. Rubovits & Brother, testified that a month or two before McDonald was injured he went up on the elevator with the son of Edward Rubovits; that he saw that the water meter was fastened between the spokes of the sheave wheel, the sheave wheel being the wheel over which the cable passes that lifts and lowers the elevator; that the meter was about eight inches in diameter and was set in between the spokes of the sheave wheel and was fastened to the sheave wheel by wire running through holes in an extended part of the meter, the wire running around and being attached to the spokes. He further testified that on the occasion referred to he observed that "the meter slid back and forth, as the sheave wheel turned, the meter slid," and that he could hear it, "it made a clicking noise when the wheel turned"; that when it did slide it would move "maybe an inch or two." He further stated that he thought it was expected to slide and that it was purposely loose in order to register the water that passed through it. As to how near he got to the sheave wheel, he stated that he got on top of the elevator beam and stood up and climbed up on the structure to get on top of the building; that he saw the meter moving, "slipping backward and forward as it moved"; that "while the elevator was running, somebody was running it while I was watching, and I could see the wheel revolve, and I took notice of the meter"; that Rubovits was with him at the

time; that the elevator was used as a freight elevator. On cross-examination he testified that when he and Rubovits went up, where the sheave wheel was, they were going out on the roof of the building; that the roof was a few feet above the sheave wheel; that there was a little house built over the shaft and it was just a step or two up to get on to the roof; that he used the elevator daily; that when he went up and down the elevator he did not notice any trouble with the sheave wheel or with the water meter; that when he used the elevator he handled it himself; that there was no attendant; that there were four or five tenants in the building besides Rubovits.

The witness Retzer, who at the time of the injury to McDonald was working for Rubovits, testified that he was standing by the side of the elevator when the meter fell; that before the accident happened there seemed to be an unusual noise in the elevator when he rode up and down in it. "There seemed to be something, as if something was sliding up and down"; that it came from the sheave wheel at the top; that he could hear the noise as the wheel revolved; that he could see the meter up there when he was on the elevator platform; that he thought it was about a week or so before the accident that he "first noticed that unusual sliding noise coming from up there in the sheave wheel." On cross-examination he stated that he went up and down in the elevator several times a day; that he had no occasion to examine the sheave wheel or the meter, but that he knew there was a water meter up there and knew its purpose; that he did not see it until after it had fallen; that it was about ten inches in diameter. On redirect examination he stated that the elevator was called a hydraulic elevator, operated by water power, and that the meter was there to measure the water which was consumed in its operation.

The evidence of one Heermans, called by the de-

fendant, who was a mechanical engineer and had had experience in hydraulic elevators, is to the following effect: That meters were supplied with some classes of hydraulic elevators; that they were used to count the number of revolutions of the sheave wheel and show a record of the amount of water used by the cylinder of the machine; that they were usually placed between the arms of the sheave wheel, sometimes overhead and sometimes on the machine itself; that the meter registered the revolutions of the wheel and from that could be determined the quantity of water consumed; that a meter for the purpose of ascertaining the amount of water used does not necessarily have to be placed in the sheave wheel overhead; that it is "generally located in connection with the machine itself, in the cylinder," sometimes at the bottom, sometimes in the traveling sheaves that move vertically. On cross-examination he testified that before the city will allow the operation of hydraulic elevators with the city water, it is necessary to have a water meter connected with the elevator to measure the water that is consumed; that in placing such meter they always try to place it on the most rapidly revolving sheave, and in some instances that sheave was at the top of the shaft and that that was the most convenient place; and when that was the situation the meter was put in between the spokes of the sheave wheel. On recross-examination he stated that an elevator manufacturing company that he had been connected with furnished the necessary meter equipment with the elevator.

One Hoggins, called by the defendant, an elevator constructor of forty years' experience, testified that the water meter is to record the number of revolutions of the wheel to determine the amount of water used. When asked, "Do you know where those water meters were placed in connection with hydraulic elevators?" he answered, "Well, yes, they are generally

at the top of the hatchway, the door on the machine.''
And when asked, ''That is in any wheel that revolves
at the same time when the water is being used?'' he
answered, ''Yes.'' He further testified that there are
meters that could be read directly and others that had
to be multiplied according to the ratio of the machine;
that on a fast machine there is a direct reading; that
the sheave wheel in the instant case was a fast one
and the meter was probably a direct reading one; that
the meters were placed either above or below and
when placed below would be right alongside of the
elevator at the bottom of the pit. He further stated
that from 1890 to 1894 such meters ''were generally
put at the machine at the top, because it was easier
to get at.''

The evidence shows that the lessees paid their pro-
portionate share of the water rates for the operation
of the elevator and that bills were rendered therefor
monthly together with those for the rent.

At the close of all the evidence the following in-
structions were given to the jury:

''The jury are instructed that the question you have
to determine from a preponderance of the evidence
in this case is whether the water meter referred to in
the evidence in this case was or was not a part of the
elevator within the terms and meaning of the lease
between plaintiff and defendant in evidence in this
case, under which defendant agreed, at his own ex-
pense, to keep the elevator in good condition and re-
pair.

''The jury are instructed that if you find from the
preponderance of the evidence in this case that the
water meter referred to in the evidence in this case
was and constituted a part of the elevator within the
terms and meaning of the lease between plaintiff and
defendant in evidence in this case, then your verdict
should be in favor of plaintiff in the sum of $2,511.28.

''If on the other hand the jury find from a prepon-
derance of the evidence that said water meter did not
within the terms and meaning of the lease constitute

a part of the elevator, then you should find in favor of defendant.''

The jury found the issues for the plaintiff and assessed his damages at $2,511.28, and upon that verdict the judgment herein appealed from was entered.

From the foregoing it will be seen that whether the meter was a part of the elevator, within the meaning of the lease, was submitted to the jury as a question of fact, and, as the jury found that it was, the question remains to be considered whether that finding is sufficiently sustained by the evidence.

In *Trego v. Rubovits, supra,* the court said that the question whether the water meter ''is a part of the elevator within the meaning of the lease'' is ''one of fact to be settled by the jury after it has heard all the evidence bearing on that question.''

Standing there, as it did, as a structure and a part of the premises leased, and described in the lease as an elevator which the tenant was to keep in good condition and repair, it would seem to be an anomalous interpretation of the word ''elevator'' to hold that the parties when using that word meant to segregate the water meter, which was attached to the spokes of the sheave wheel and thereby became an integral part of the sheave wheel, revolving as a part of that wheel. It is true that an hydraulic elevator may be complete and work as an elevator without a water meter, but here we must assume that the *res* referred to by the contracting parties as an elevator was the structure as it stood in the building in question. We cannot reasonably believe that the parties intended when using the word ''elevator,'' having in mind the evidence, to exclude therefrom that which constituted a fixed part of the sheave wheel, and without which the sheave wheel could not, at the very time of making the contract, revolve. There may be many parts to an elevator, all of which are not actually necessary to its physical operation.

Inasmuch as it was the function of the jury to determine whether the water meter was part of the elevator, having in mind the use of the word "elevator" in the lease in question, and as considerable evidence on that subject was submitted to the jury, and they found that under the terms of the lease the water meter constituted part of the elevator, we do not feel justified in overriding the verdict and holding that the evidence was insufficient.

Finding no error in the record the judgment will be affirmed.

*Affirmed.*